IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION

FILED
MAY 1 7 2013
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
        DEPUTY CLERK

| | |
|---|---|
| WEST TEXAS NATIONAL BANK, § | |
| Plaintiff, § | |
| § | |
| v. § | MO-11-CV-086 |
| § | |
| FEC HOLDINGS, LP, § | |
| FEC MESQUITE, LP, § | |
| L.R. (ROBIN) FRENCH III, JOHN D. § | |
| MULLEN, JR., § | |
| Defendants. § | |

| | |
|---|---|
| FEC HOLDINGS, LP, and § | |
| FEC MESQUITE, LP, § | |
| Counter-Plaintiffs, § | |
| § | |
| v. § | MO-11-CV-121 |
| § | (Consolidated with Civil Action |
| WEST TEXAS NATIONAL BANK, § | No.: MO: 11-CV-00086-RAJ) |
| CITY BANK TEXAS, KEITH MOORE, § | |
| and TYLER MOORE, § | |
| Counter-Defendants. § | |

<u>**MEMORANDUM OPINION GRANTING DEFENDANTS FEC HOLDINGS, LP AND FEC MESQUITE, LP'S MOTION TO DISMISS SECOND AMENDED COMPLAINT AND MEMORANDUM OPINION GRANTING DEFENDANTS LLOYD R. FRENCH III AND JOHN D. MULLEN, JR.'S MOTION TO DISMISS SECOND AMENDED COMPLAINT**</u>

Before the Court are Plaintiff West Texas National Bank's Second Amended Complaint (Doc. No. 44, MO-11-CV-86), Defendants FEC Holdings, LP and FEC Mesquite, LP's Motion to Dismiss Second Amended Complaint (Doc. No. 47), Defendants Lloyd R. French III and John D. Mullen, Jr.'s Motion to Dismiss Second Amended Complaint (Doc. No. 48), Plaintiff's Consolidated Response to Defendants FEC Holdings, LP and FEC Mesquite, LP's Motion to Dismiss Second

1

Amended Complaint and Response to L. R. French III and John D. Mullen, Jr.'s Motion to Dismiss Second Amended Complaint (Doc. No. 51), Defendants Lloyd R. French III and John D. Mullen, Jr.'s Reply to Response to Motion to Dismiss Second Amended Complaint (Doc. No. 52), and Defendants FEC Holdings, LP and FEC Mesquite, LP's Reply to Response to Motion to Dismiss Second Amended Complaint (Doc. No. 53). The Court held a hearing over the motions on April 29, 2013. At said hearing, the Court orally granted the motions. The Court now issues its memorandum opinion.

## BACKGROUND

### I. Procedural

Plaintiffs FEC Holdings, LP and FEC Mesquite filed suit against Defendants West Texas National Bank, City Bank of Texas, Keith Moore, and Tyler Moore on August 3, 2011, in the Southern District of Texas, Houston Division styled Cause No. H 11-2873. One day later, Plaintiff West Texas National Bank filed suit against Defendants FEC Holdings, LP, FEC Mesquite, LP, Lloyd R. French III, and John D. Mullen, Jr. on August 4, 2011, in the Western District of Texas, Midland-Odessa Division styled Cause No. MO-11-CV-86. On November 1, 2011, the Houston case—Cause No. H 11-2873— was transferred to the Western District of Texas, Midland-Odessa Division due to the agreed choice of forum clause in the loan agreement at issue entered into by FEC Holdings, LP and Western National Bank. On November 4, 2011, the Houston case was then assigned to this Court and styled Cause No. MO-11-CV-121. Thereafter, on January 25, 2012, the original Houston case—now Cause No. MO-11-CV-121—was consolidated with the original Midland case into Cause No. MO-11-CV-86.

**II.     Factual**

The facts listed here stem from the case originally filed in the Western District of Texas, Midland-Odessa Division. This lawsuit arises out of a series of commercial loan transactions between Plaintiff West Texas National Bank ("WTNB") and Defendant FEC Holdings, LP ("FEC") and its subsidiaries. WTNB alleges Defendants L.R. French, III and John Mullen, Jr., with a group of private equity investors, formed FEC and multiple subsidiaries, including FEC Mesquite, in order to open Incredible Pizza Company ("IPC") franchises, which are similar to that of Mr. Gatti's Pizza. Second Am. Compl. ¶ 10, Doc. No. 44. In the Fall of 2006, French, Mullen, and FEC allegedly approached WTNB seeking financing to open some of FEC's IPC restaurants, including restaurants in Texas, Oklahoma, and Louisiana. *Id.* ¶ 11. During these initial meetings and in follow-up materials, WTNB claims French and Mullen represented that FEC was IPC's largest franchisee, with exclusive markets throughout Texas, and in parts of Oklahoma, Louisiana, Kansas, Florida, New Mexico, Arizona, and Alabama. *Id.* WTNB states FEC, French, and Mullen sought financing for multiple stores, and each store would be a subsidiary of FEC (which would continue to own 99% of each store). *Id.* ¶ 12.

To obtain the financing, WTNB alleges FEC intentionally, deliberately, and repeatedly misrepresented the qualifications and experiences of its executives, including Mullen, and its financial ability to succeed to WTNB and other FEC investors and potential lenders. *Id.* ¶¶ 12-13. For example, WTNB claims French and Mullen, in order to obtain WTNB financing, specifically represented during an initial presentation to WTNB on October 18, 2006 in Houston and in a follow-up meeting on October 26, 2006 in Houston that: (a) Mullen had owned and operated one of the top Gatti's pizza franchises for a long period of time and had a wealth of pizza store ownership

3

and operational experience when allegedly he had owned a franchise for less than 70 days and had no operational experience; (b) Mullen had served as Gatti's president (a company IPC sought to compete with) and would provide FEC a significant competitive advantage, when allegedly Mullen had served as president of Gatti's for less than 60 days; (c) Mullen led over 400 Gatti's locations as president, when allegedly there were only 150 locations during the limited time Mullen was Gatti's president; (d) Mullen was serving as an active partner in FEC when allegedly he was only a consultant; (e) Mullen had significant industry contacts and access in order to hire key management personnel when allegedly he did not; and (f) French had the ability and necessary approvals to access additional capital from FEC's investment group, when allegedly he did not. *Id.* ¶ 13. WTNB also claims French and Mullen made these same misrepresentations in their 2006 financing package, which they presented to WTNB personnel at these meetings and later circulated as part of FEC's loan application submission to WTNB for each of the loans described below. *Id.*

WTNB further claims, in connection with each loan application and request for modification to the loans once funded, French represented that he was not personally guaranteeing any of the loans FEC obtained from any other financial institution. *Id.* ¶ 14. Such statements, however, WTNB contends were false, as French allegedly personally guaranteed FEC's, or its subsidiaries', debts owed to Sterling Bank or its affiliates. *Id.*

Because FEC was a start-up company, WTNB states it based its lending decisions largely on the represented expertise of the FEC management team and relied on French and Mullen's representations when making loan decisions. *Id.* ¶ 16. Based on the representations regarding the management team's experience as well as the representations regarding FEC's available capital and investors, WTNB made the following loans:

 (a)  December 25, 2006: $ 3.5 million loan to FEC MacArthur OKC, LLC

 (b)  July 27, 2007:  $ 3.6 million loan to FEC Lafayette, LLC

 (c)  November 30, 2007: $ 3.6 million loan to FEC El Paso, LP

 (d)  February 11, 2008: $ 3.6 million loan to FEC Mesquite

 (e)  October 28, 2008: $ 1.2 million loan to FEC.

*Id.* WTNB states the first four loans were made to fund the construction and build-out of the pizza stores, as well as equipment purchase. *Id.* ¶ 17. In September 2008, WTNB claims Defendants sought the fifth loan to provide operating liquidity to bridge the period while stores damaged by the Gulf of Mexico hurricanes were being repaired, until insurance proceeds were received for the damages and until their investors could help to restore FEC's liquidity. *Id.* ¶ 19.

 WTNB alleges Defendants then blamed the economy for further poor performance, and in March 2009, WTNB agreed to restructure the loans by reducing the collective monthly payments for the loans by $75,000 through April 2010, effectively extending the terms of the loans from 7-year terms to 10-year terms. *Id.* ¶ 20. Defendants made the payments as agreed for approximately 10 months, when some FEC entities, including FEC MacArthur OKC, FEC Lafayette, and FEC El Paso (among others), filed for bankruptcy protection. *Id.* At the time of the bankruptcy filing, WTNB claims FEC and FEC Mesquite still owed WTNB over $11,500,000, and WTNB had made demand on Defendants for payment multiple times to no avail. *Id.* ¶ 21.

 Additionally, WTNB states the original loan for the FEC Mesquite restaurant was issued for build-out and to make leasehold improvements. *Id.* ¶ 22. WTNB claims, however, the loan proceeds were not used as promised; instead, building contractors filed liens against the FEC Mesquite location for work performed during the build-out for which FEC failed to pay. *Id.* WTNB

alleges it appeared the funds were either misdirected to Mullen and French personally, to other investors, or to fund the stores where personal guarantees were made. *Id.*

After WTNB agreed to re-work the FEC Mesquite loan (and all the loans), WTNB claims on January 20, 2010, Mullen and French sold a portion of the FEC Mesquite property and equipment that was used to secure and collateralize the FEC Mesquite loan and distributed the rest to the stores financed by other banks where personal guarantees were made. *Id.* ¶ 23. WTNB alleges Mullen and French, as well as Karen Fohn, FEC's CFO, failed to disclose they had closed the FEC Mesquite restaurant and sold the equipment and property in direct violation of Defendants' contractual obligations to WTNB. *Id.* In addition, WTNB states Defendants have repeatedly refused to disclose who they sold WTNB's collateral to, inhibiting WTNB's ability to pursue recovery of their collateral. *Id.*

As a result of Defendants' allegedly continued fraudulent conduct, WTNB filed suit seeking damages for the following claims: (1) fraud/fraudulent inducement; (2) breach of contract; (3) tortious interference with contract; (4) negligent misrepresentation; (5) conversion of collateral; (6) violation of RICO: 18 U.S.C. § 1962(b); (7) violation of RICO: 18 U.S.C. § 1962(c); and (8) violation of RICO: 18 U.S.C. § 1962(d). Defendants filed motions to dismiss on October 21, 2011. The Court denied those motions without prejudice and *sua sponte* ordered WTNB to replead. WTNB filed its Second Amended Complaint on September 4, 2012. Defendants filed their motions to dismiss currently before the Court on September 18, 2012, pursuant to Rules 9(b), 12(b)(1), and 12(b)(6).

## STANDARDS OF REVIEW

### I. Rule 12(b)(6) Standard

Federal Rule of Civil Procedure 12(b)(6) allows a defendant to present, via motion, a defense for failure to state a claim upon which relief can be granted. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). In reviewing a Rule 12(b)(6) motion, the court must accept all well-pleaded facts as true and view them in the light most favorable to the non-moving party. *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). However, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. To survive dismissal, a plaintiff must plead specific facts that "state a claim to relief that is plausible on its face," not mere conclusory allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Supreme Court in *Iqbal* explained that *Twombly* promulgated a "two-pronged approach" to determine whether a complaint states a plausible claim for relief. *Id.* at 679. First, the court must identify those pleadings that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* Legal conclusions "must be supported by factual allegations." *Id.*

Upon identifying the well-pleaded factual allegations, the court should "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. This is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## II. Rule 12(b)(1) Standard

Rule 12(b)(1) of the Federal Rules of Civil Procedure authorizes the filing of a motion to dismiss a case for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Federal courts are "courts of limited jurisdiction, having only the authority endowed by the Constitution and that conferred by Congress." *Halmekangas v. State Farm Fire and Cas. Co.*, 603 F.3d 290, 292 (5th Cir. 2010) (internal quotes and citation omitted). A lawsuit must be dismissed for lack of subject matter jurisdiction "when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (internal quotation marks and citation omitted). The district court "has the power to dismiss for lack of subject matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Stiftung v. Plains Marketing, L.P.*, 603 F.3d 295, 297 (5th Cir. 2010) (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)). The party seeking to litigate in federal court bears the burden of establishing subject matter jurisdiction. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citing *BarreraMontenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996)).

## III. Rule 9(b) Standard

The Federal Rules require that a plaintiff include a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Fed. R. Civ. P. 9(b). Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally. *Id.* The Fifth Circuit interprets Rule 9(b) to require at minimum "specificity as to the

statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation of why they were fraudulent." *Plotkin v. IP Axess, Inc.,* 407 F.3d 690, 696 (5th Cir. 2005); *see also Williams v. WMXTechnologies, Inc.,* 112 F.3d 175, 179 (5th Cir. l997) (Rule 9(b) requires " 'the who, what, when, where, and how' to be laid out.") (citations omitted). A dismissal for failure to plead with particularity as required by Rule 9(b) is treated the same as a Rule 12(b)(6) dismissal for failure to state a claim. *Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1017 (5th Cir. 1996).

## DISCUSSION

Defendants argue WTNB's Second Amended Complaint fails to state an actionable claim under RICO. Specifically, Defendants dispute the Second Amended Complaint properly alleges the existence of a RICO enterprise, and assert the Second Amended Complaint fails to allege a pattern of racketeering activity. As Defendants articulate, this Court's jurisdiction is based upon the RICO Act. Further, the parties are all citizens of Texas, and all of WTNB's remaining claims are based upon state law. Therefore, Defendants seek dismissal of the Second Amended Complaint in its entirety claiming it fails to establish federal question jurisdiction.

## I. RICO VIOLATIONS

WTNB alleges RICO violations under 18 U.S.C. § 1962(b), (c) and (d). Essentially, these subsections provide: (b) a person cannot acquire or maintain an interest in an enterprise through a pattern of racketeering activity; (c) a person who is employed by or associated with an enterprise cannot conduct the affairs of the enterprise through a pattern of racketeering activity; and (d) a person cannot conspire to violate subsections (a), (b), or (c). *Crowe v. Henry,* 43 F.3d 198, 203 (5th Cir. 1995). To plead a RICO claim under § 1962, WTNB must allege "(1) a person who engages

in (2) a pattern of racketeering activity (3) connected to the acquisition, establishment, conduct, or control of an enterprise." *Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 242 (5th Cir. 1988). Assuming that the three elements of a RICO person, a pattern of racketeering activity, and a RICO enterprise are met, the Court may then continue to the substantive requirements of each respective subsection.

### A.      18 U.S.C. § 1962(b) and (c)

#### 1.      RICO Persons

The RICO person in a civil or criminal RICO action is the defendant. *Landry v. Air Line Pilots Ass'n Int'l*, 901 F.2d 404, 425 (5th Cir. 1990). The statute defines the RICO person as including "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). "This is a very broad definition." *Crowe*, 43 F.3d at 204.

In this case, WTNB has alleged two RICO persons in its Second Amended Complaint—French and Mullen. As to French and Mullen, the Court concludes WTNB has succeeded in naming a sufficient RICO person. French and Mullen are both individuals capable of holding a legal or beneficial interest in property and thus they both meet the statutory definition. *See* 18 U.S.C. § 1961(3).

#### 2.      RICO Enterprise

To establish liability under any subsection of § 1962, a plaintiff must allege the existence of an enterprise. *United States v. Turkette*, 452 U.S. 576, 580–81 (1981). An " 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity; ...." 18 U.S.C. § 1961(4). The enterprise must be distinct from the defendant person. *Atkinson v. Anadarko Bank and Trust Co.*, 808 F.2d

438, 439 (5th Cir. 1987); *Bishop v. Corbitt Marine Ways, Inc.*, 802 F.2d 122, 122-23 (5th Cir. 1986). It is not enough to establish that a defendant corporation through its agents committed the predicate acts in the conduct of its own business. *Elliott v. Foufas*, 867 F.2d 877, 881 (5th Cir.1989).

Here, WTNB names FEC Holdings, LP and the FEC subsidiaries, including FEC Mesquite, as the "enterprise" as the term is defined under the RICO statute.[1] Second Am. Compl. ¶¶ 28, 54. Because WTNB has pled the RICO persons are French and Mullen and the RICO enterprise consists of FEC Holdings, LP and the FEC subsidiaries, these allegations are sufficient to demonstrate that the RICO person, an employee or owner[2] of the corporation/partnership, is distinct from the RICO enterprise, the corporation/partnership itself. *Abraham v. Singh*, 480 F.3d 351, 357 (5th Cir. 2007); *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001) ("The corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity").

### 3. Pattern of Racketeering

A "pattern of racketeering activity" requires at least two acts of racketeering activity. *See Whelan v. Winchester Prod. Co.*, 319 F.3d 225, 231 n. 4 (5th Cir. 2003). "Racketeering activity" is defined in § 1961(1) in terms of a list of state and federal crimes. *See* 18 U.S.C. § 1961(1); *Bonton v. Archer Chrysler Plymouth, Inc.*, 889 F.Supp. 995, 1001 (S.D. Tex. 1995). It includes acts indictable under 18 U.S.C. § 1344, relating to bank fraud as WTNB pleads here. *See* 18 U.S.C. §

---

[1] The Court notes WTNB states in the Second Amended Complaint that "Defendant French led and was associated with an enterprise consisting of FEC, FEC Mesquite, Mullen, and other entities and individuals controlled or employed by FEC ...." Second Am. Compl. ¶ 7. As explained in WTNB's Response to Defendants' Motions to Dismiss, upon repleading, it was an oversight that Mullen's name was not deleted from that paragraph. Further, WTNB points out in its Second Amended Complaint where the causes of actions are pled, it specifically states who WTNB claims are the RICO persons and RICO enterprise.

[2] WTNB pleads French and Mullen, along with a group of investors, formed FEC and multiple subsidiaries to open IPC. Second Am. Compl. ¶ 10.

1961(1)(B); *Whelan*, 319 F.3d at 231. The individual acts of "racketeering activity" are usually described as the "predicate offenses." *Bonton*, 889 F.Supp. at 1001.

Although at least two acts of racketeering are necessary to constitute a pattern, two acts may not be sufficient. *Bonton*, 889 F.Supp. at 1003. To establish a pattern of racketeering activity, a plaintiff must show that the racketeering predicates are <u>related</u>, and that they amount to or pose a threat of <u>continued</u> criminal activity. *Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer*, 90 F.3d 118, 122 (5th Cir.1996) (citing *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (emphasis added)). "It is this factor of *continuity plus relationship* which combines to produce a pattern." *H.J. Inc.*, 492 U.S. at 239 (original emphasis). Relatedness is present where: "criminal acts . . . have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240. Continuity can be shown in two ways: closed-ended continuity ("a closed period of repeated conduct") and open-ended continuity ("past conduct which by its nature projects into the future with a threat of repetition"). *Id.* at 241.

In order to show closed-ended continuity, a plaintiff may prove "a series of related predicates extending over a substantial period of time." *Id.* at 242. The Supreme Court admonished: "predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct." *Id.*

Alternatively, under open-ended continuity the threat of continued racketeering activity must be either implicitly or explicitly present. *Id.* The Supreme Court emphasized that determining whether predicate acts pose a threat of future criminal activity must be based upon the facts presented in each case. *Id.* The Supreme Court stated that an example of open-ended continuity is

12

where racketeering activity "is part of an ongoing entity's regular way of doing business," or conducting its affairs, whether the entity is a long-term association existing for criminal purposes or a legitimate business or enterprise. *Id.* at 242–43.

WTNB pleads French and Mullen's predicate acts of bank fraud (e.g., making misrepresentations in a scheme to defraud WTNB, a federally insured financial institution, to obtain funds owned by WTNB with no intention to fully re-pay WTNB) constitute both a closed period of repeated conduct and a regular way of conducting their ongoing business. First, regarding relatedness, WTNB adequately pleads the acts are related—the alleged misrepresentations were all made by French and/or Mullen to WTNB to induce WTNB into loaning Defendants money or refinancing current loans for their pizza business. Regarding, continuity, however, WTNB pleadings fail to sufficiently establish the predicate acts of bank fraud amount to or pose a threat of continued criminal activity.

WTNB first alleges the misrepresentations that formed the basis of the bank fraud were made by French and/or Mullen on the following dates: October 18 and 26, 2006, September 2008, December 2008, and March 2009. Second Am. Compl. ¶¶ 11-15, 19-20. As to closed-ended continuity, WTNB's pleadings do not meet to requirement that theses predicate acts extend over a substantial period of time. The alleged misrepresentations to acquire the loans, as Defendants argue, are merely sporadic events. The first two alleged misrepresentations took place eight days apart, and the next two alleged misrepresentations in 2008 were a month apart. The last alleged misrepresentation regarding refinancing a loan did not occur until March 2009. Paying heed to the Supreme Court's admonition, the Court finds WTNB's pleadings of sporadic predicate acts do not

13

satisfy closed-ended continuity. *See H.J. Inc.*, 492 U.S. at 239 (stating that a person is not subject to liability "simply for committing two widely separated and isolated criminal offenses").

As to open-ended continuity, WTNB pleads "[t]he same or similar misrepresentations were made to FEC investors on information and belief and other lenders, including Sterling Bank, with the intent to defraud both FEC's investors and its lenders." Second Am. Compl. ¶¶ 34, 43. Again, the Supreme Court emphasized that whether the threat of continued predicate activity is present depends on the specific facts of each case. *H.J., Inc.*, 492 U.S. at 2902. Here, WTNB's pleadings regarding Defendants' regular way of doing business are merely conclusory and fail to plead the by whom, when, and where any such misrepresentations were made. As such, WTNB's pleadings also fail to satisfy open-ended continuity.

Even taking WTNB's facts as true, WTNB's allegations are insufficient to demonstrate the "continuity plus relationship" required to establish a pattern of racketeering. Thus, WTNB fails to plead a pattern of racketeering activity, and, therefore, WTNB's RICO claims under § 1962(b) and (c) fail. Accordingly, the Court grants Defendants' motions to dismiss as to these claims.

**B.     18 U.S.C. § 1962(d) - conspiracy**

WTNB also asserts Defendants conspired, in violation of 18 U.S.C. § 1962(d), to misrepresent FEC's financial condition, their own expertise and experience, and French's willingness to, ability to, and previous history of providing personal guarantees to WTNB. WTNB alleges the object of the Mullen and French conspiracy was to induce WTNB (and its participating lenders) to provide funding for loans and projects that the FEC enterprise was never going to complete and that Defendants, including French and Mullen, never intended to fully re-pay. "In order to demonstrate a RICO conspiracy under § 1962(d), [WTNB] must demonstrate (1) that two

14

or more people agreed to commit a substantive RICO offense and (2) that [Defendants] knew of and agreed to the overall objective of the RICO offense." *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 239 (5th Cir. 2010) (internal citations omitted). "A person cannot be held liable for a RICO conspiracy merely by evidence that he associated with other ... conspirators or by evidence that places the defendant in a climate of activity that reeks of something foul. A conspirator must at least know of the conspiracy and adopt the goal of furthering or facilitating the criminal endeavor." *Id.* (internal citations and quotation marks omitted). Defendants argue WTNB's § 1962(d) claim should be dismissed because WTNB failed to plead an actionable RICO claim under § 1962(b) and (c). The Court agrees.

"[B]ecause the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement." *Tel-Phonic Services, Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1140 (5th Cir. 1992). In *Crowe v. Henry*, the Fifth Circuit affirmed a Rule 12(b)(6) dismissal of mere conclusory allegations of the agreement upon which an alleged § 1962(b) RICO conspiracy was based. 43 F.3d 198, 205 (5th Cir. 1995). Here, likewise, WTNB conclusorily alleges, that Defendants conspired and agreed to participate in the enterprise. However, nowhere does WTNB allege facts implying any agreement to commit predicate acts of racketeering. Further, having found that WTNB failed to state a claim under 18 U.S.C. § 1962(b) and (c), WTNB's claim under 18 U.S.C. § 1962(d) must also fail since its violation is predicated upon the violation of § 1962(b) and/or (c). *See* 18 U.S.C. § 1962(d). As such, even taking WTNB's facts as true, WTNB's claim under 18 U.S.C. § 1962(d) fails, and Defendants' motions are granted as to this claim.

## II. STATE LAW CLAIMS

WTNB has further alleged the following state law claims:(1) fraud/fraudulent inducement; (2) breach of contract; (3) tortious interference with contract; (4) negligent misrepresentation; and (5) conversion of collateral. Defendants argue WTNB's state law claims should be dismissed because WTNB has not pled a viable RICO claim that could sustain federal question jurisdiction. The Court agrees.

In *United Mine Workers v. Gibbs*, the Supreme Court explained the extent of pendent jurisdiction, noting that the justification for pendent jurisdiction

> lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

383 U.S. 715, 726 (1966) (footnotes and citations omitted). The Supreme Court has not treated *Gibbs* as establishing a bright-line rule for pendent jurisdiction but has called for a more flexible analysis, balancing the values of economy, convenience, fairness, federalism, and comity. *See, e.g., Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 & n. 7 (1988) (citing *Rosado v. Wyman*, 397 U.S. 397, 403–05 (1970)). The *Carnegie-Mellon* Court did state, though, when the single federal-law claim is eliminated at an "early stage" of the litigation, the district court has "a powerful reason to choose not to continue to exercise jurisdiction." *Carnegie-Mellon*, 484 U.S. at 351. The Fifth Circuit's general rule is to dismiss state claims when the federal claims to which they are pendent are dismissed. *Wong v. Stripling*, 881 F.2d 200, 204 (5th Cir. 1989).

Above, the Court dismissed WTNB's RICO claims; the only issues remaining are state law claims. As such, the Court will consider the factors outlined above in *Gibbs* in its decision regarding the remaining state law claims.

At this stage of the proceedings, judicial economy will be served by dismissal. It is true that some substantial discovery has occurred in this case. For example, a number of written discovery matters have been exchanged by the parties and depositions have begun. Nonetheless, the proceedings—motions to dismiss—are at a relatively early stage. *See Parker & Parsley Petroleum Co. v. Dresser Industries*, 972 F.2d 580, 587 (5th Cir. 1992). The trial is scheduled for November 2013 and discovery has not been completed. In addition, the Court has conducted only two telephone status conferences. In any event, the Court is not yet so involved in the case that proceeding further in federal court will prevent redundancy and will conserve substantial judicial resources. *Id.* "Nor would it serve judicial economy to reward a plaintiff by allowing it into federal court when it pleads a baseless RICO suit." *Id.*

Further, dismissal will not cause undue inconvenience to the litigants. Little new legal research would be necessary, as the surviving claims are governed by state law, and any additional factual research would need to be conducted anyway. *See id.* Additionally, the most expensive element of the trial preparation—discovery—would be usable in any state proceeding.

The fairness factor concerns the prejudice to the parties that would arise from dismissal, and it too weighs in favor of dismissal. *Id.* at 588. Section 16.064(a) of the Texas Civil Practice and Remedies Code provides that the statute of limitations is tolled while a case is pending in a court that lacks jurisdiction. Although § 16.064(b) says that the tolling does not apply if the plaintiff filed its initial suit "with intentional disregard of proper jurisdiction," that should not be a problem here.

17

Both parties have filed lawsuits against each other alleging RICO violations and the Court is dismissing both parties' RICO claims. Therefore, the Court does not see any party raising a statute of limitations defense in a state proceeding. Further, the parties would not have to repeat the effort and expense of the discovery process in the state proceeding. *See Waste Sys. v. Clean Land Air Water Corp.*, 683 F.2d 927, 931 (5th Cir. 1982) (fact that discovery could be used in state court proceeding weighs in favor of dismissal of case from federal court).

Lastly, dismissal would serve the important interests of federalism and comity. "The federal courts are courts of limited jurisdiction, and often are not as well equipped for determinations of state law as are state courts." *Parker & Parsley,* 972 F.2d at 588–89 (citation omitted). Aside from the state courts' superior familiarity with their respective jurisdictions' law, the federal courts' construction of state law can be "uncertain and ephemeral." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 122 n. 32 (1984). "[F]ederal courts are not the authorized expositors of state law; there is no mechanism by which their errors in such matters can be corrected on appeal by state courts." *Parker & Parsley,* 972 F.2d at 589 (citations omitted); *see also United Gas Pipe Line Co. v. Ideal Cement Co.*, 369 U.S. 134, 135 (1962) (per curiam) (state court defines authoritative meaning of state law). In the instant case, the interests of federalism and comity point strongly toward dismissal as all of the remaining legal issues of the case are of state law.

Based on these factors and because this Court has dismissed all of WTNB's federal claims, this Court declines to exercise jurisdiction over the pending state claims of WTNB. *See Gibbs*, 383 U.S. at 726 (Because the federal claims were properly dismissed before trial, the Court can, in its discretion, dismiss the pendent state law claims as well.); *Parker & Parsley,* 972 F.2d at 590 (Held

district court abused its discretion in retaining jurisdiction over the state law claims after it had dismissed the federal RICO claims.).

## CONCLUSION

Based on the above stated reasons and taking the facts pled as true, the Court finds WTNB has failed to adequately plead its RICO claims. As such, the Court dismisses WTNB's RICO claims, and declines to exercise jurisdiction over the remaining state law claims. Accordingly,

**IT IS ORDERED** that Defendants FEC Holdings, LP and FEC Mesquite, LP's Motion to Dismiss Second Amended Complaint (Doc. No. 47, MO-11-CV-86) is hereby **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants Lloyd R. French III and John D. Mullen, Jr.'s Motion to Dismiss Second Amended Complaint (Doc. No. 48, MO-11-CV-86) is hereby **GRANTED**.

**IT IS SO ORDERED.**

SIGNED this 7th Day of **May, 2013**.

ROBERT JUNELL
United States District Judge
Western District of Texas